ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
Seth Ritchie,
     Plaintiff,

          COMPLAINT

          JURY TRIAL REQUESTED

     -against-          Civil No. 09 3505



TOWNES, J.
CARTER, M.J.

P.S.C.H., Inc, Alan Weinstock, Nathene
Riley, Joel Telford, Kesha Graham,
Adrian Allain, Owen Alexander, Latham
Davis, Latchmine Mattow, Edward
Taub, Lisa Hassanova, and Valerie Baker
     Defendants
-----------------------------------------------------------X

1. Parties: Plaintiff- Seth Ritchie resides at- 1900 Sterling Place in the County of Brooklyn , City Of New York , 11233.

2. Defendants- Alan Weinstock, Nathene Riley, Adrian Allain, Lachmine Mattow, Edward Taub and Lisa Hassanova works for- PSCH, Inc and their place of business is- 30-50 Whitestone Expressway, Flushing, N.Y. 11354.

3. Defendants Joel Telford, Kesha Graham, Owen Alexander, Latham Davis, and Valerie Baker, works for PSCH Inc, at the location that the Plaintiff resides- 1900 Sterling Place, Brooklyn, N.Y. 11233.

NOTE: All Defendants either directly participated in the wrong and or knew about the wrong and refused to correct. Defendants in Supervisory capacity failed to manage subordinates and also knew about the wrong and failed to correct.

The Jurisdiction this Court has over these matters is Pursuant to 28 U.S.C. §1331. The acts occurred in the County of Brooklyn , City Of New York .

## DAMAGES REQUESTED

Plaintiff seeks 1 million dollars in damages and also seeks Court Orders to correct the wrong doing, ie, deprivations and violations.

DEFENDANTS

1. Alan Weinstock-President-PSCH, Inc
2. Nathene Riley-Mental Health Deputy Director-PSCH, Inc,
3. Joel Telford-Program Director- Horizon I and II,
4. Kesha Graham-Assistant Program Director- Horizon II,
5. Adrian Allain-Director-Quality Assurance-PSCH, Inc,
6. Owen Alexander-Direct Care Counslor-Horizon I,
7. Latham Davis-Direct Care Counslor-Horizon II,
8. Latchmine Matlow-Quality Assurance-PSCH, Inc,
9. Edward Taub-Quality Assurance-PSCH,Inc,
10. Lisa Hassanova-Entitlements-PSCH, Inc,
11. Valerie Baker-Direct Care Counslor-Horizon

1 A

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Defendants do have a Grievance Procedure that is not followed and there is no time limits to when and if they will respond to a grievance, furthermore, Defendants Grievance Procedure does not prohibit/condone retaliation when a resident files such grievance. Plaintiff was retaliated against several times for verbally and in writing grievances. Defendants have their agency listed as Not For Profit.

## CAUSES OF ACTION

Plaintiff states that the Defendants knowingly and intentionally deprived the Plaintiff of the following Constitutional Rights:

1. Amendment I-abridging the freedom of speech, and to petition the government for a redress of grievances.. The New York State Office Of Mental Health Licences, funds and or operates the Defendants facility and therefore, Pursuant to Mental Hygiene Law, has the full legal jurisdiction over the Defendants. Plaintifff contacted the New York State Office Of Mental Health New York City Field Office, The New York State Commission On Quality Of Care For the Mentally Disabled and the Office Of Mental Health's Customer Relations many times and nothing was done. Please see below.

2. Amendment IV- The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, unless upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

3. Amendment VIII-Cruel and Unusual Punishment- Retaliation, Intimidation, Harassment and Intentional Infliction Of Emotional duress .

4. Amendment VIII-Failure to Provide proper medical services.

5. Challenging the Constitutionality of the Defendants Rules, Regulations, and or Guidelines. All situations to be pled in the Complaint.

## STATEMENT OF CLAIMS

1. On May 27th, 2009, Plaintiff moved into the Defendants Agency in one of their 24 Hour staff supervised residences. Plaintiff was placed in Defendants MICA and Mental Health Floor (3rd and 4th floors) told by Defendant Telford and Riley that their was no available bed on the first or second floors which was only for Mental Health Clients.

2. Plaintiff was sevearly physically and sexually abused as a child for years by his parents who drank and did drugs. Plaintiff felt very uncomfortable in these surroundings, the residents in Horizon II drink and or do drugs daily in the facility, Defendants Riley, Telford and Graham knew this, and nothing is done. ON or about 6/10/09, a client went to an appointment with a staff and when he returned, he stated that he knew why I was in prison and began telling people in the residence and out in the street that I was a child molester and pedophile. This resident threatened physical violence against 2 different staff. Both times the police were called and he was taken out of the residence. I was not incarserated for touching any child.

3. When I found out this resident was spreading these rumors, I went to Defendants Telford, Riley and Graham.. Defendant Telford , Program Director Of Horizon House stated to me, "I was under the impression that you told this resident" meaning that he knew. Defendant Graham, Assistant Director stated to me several times, "I'am concerned for your safety" and stated that she was going to speak to Defendant Telford since I requested to be moved. Defendant Riley told me that she would check into it and never got back to me.

4. Defendants had 3 other 24 hour residences. They could have moved me and should have because the Office Of Mental Health (Hereinafter OMH) regulations state that I have a right to a safe environment. Defendant Alexander stated that this resident told him that he obtained my information at the library and defendant Davis told me that this resident stated that he obtained the information by someone that lived across the street in the projects. Defendant Davis is my Direct Care Counselor and was also this residents counselor. Said resident moved out on or about July 1st. 2009.

5. Prior to moving into the Defendants facility, Plaintiff was incarserated for 3 years and 9 months. Within 24 hours of my release, I was placed in a psychiatric unit of a hospital. I had 1 set of clothing, with no family. I begged Defendants Telford and Riley for a Personal Needs Allowance, (Hereinafter PNA) to be able to buy clothes.

6. Defendants Telford, Riley, Hassanova, and Davis told me that it takes 30 to 60 days for the benefits to be switched over and that I could not receive the PNA until the benefits went to them. Defendant Telford altered the paperwork to state that my Social Security Benefits were pending when I was already on them. These Defendants stated that this was the process for all clients. Within 1 week of arriving, the Defendants had all the SSI information switched over. I was mad that they lied and went and switched the payee. Based on what they stated, it appears that they are withholding/stealing the PNA that the clients are entitled to for their first 30 to 60 days.

7. Defendant Hassanova spoke to me on the phone stating that my SSI benefits were suspended and that they were going to be reinstated. This was on or about 6/12/09. BY 7/1/09, my SSI benefits were still suspended. Weather or not I was in

the facility, I was legally entitled to receive a SSI check. I then went to the Social Security Office, had the benefits reinstated, the representative told me that it was Defendant Hassanova that had the SSI benefits suspended.

8. Upon arrival at any such facility, all residents are entitled to Food Stamps. In the first week of arriving, I spoke with Defendant Hassanova who told me that the application for food stamps was already submitted for me on 5/27/09.

9.. Defendant Hassanova applied on 6/24/09 and not 5/27/09 or soon thereafter. I began making verbal and written complaints. Soon after receiving the food stamp card and using it to buy food, after making these complaints to Defendants Telford and Riley, Defendant Hassanova spoke to me on speaker phone with Defendant Telford asking me for the Food Stamp Card number and pin. The very next day, the Food Stamp Card was deactivated. They then lied and stated that I ordered a new card. It took a week in the mail and another 2 days because they did not want to pick up the mail at the main office. Many residents in this facility who are entitled to food stamps, they do not apply for months and or residents that are receiving these benefits, do not receive their entire amount due to the negligence of the way the paperwork is submitted.

10. The monthly fee to live in this Program is nine hundred and fifty nine dollars a month. It is called a fee. It covers for the room in which I sleep, and was supposed to also cover other services. I was told by defendant Graham and Davis, and other staff stated this as well, that I was too high functioning to be there. I'am able to take care of myself, cook, clean, do laundry, take showers, know my medications and the side effects and have good insight into my illness.

11. The 2 basic things I asked them to do was for them to escort and stay with me for medical and dental visits and to speak with someone about various life issues. The Fee agreement and other papers they gave me stated that the Direct Care Counselor assigned to me (Davis) was supposed to meet and speak to me 3 to 4 times a week for 30 minutes. There paperwork is altered to state that Defendant Davis did meet with me. Since arriving at the Defendants facility, Defendant Davis, prior to July 3rd, 2 times gave me 5 written questions on a piece of paper and then wrote that he met with me.

12. On July 3rd, 2009, Defendant Davis stated to me, "The boss said that I have to meet with you for 30 minutes because your complaining that your not receiving any services. And we did meet and speak for 30 minutes. And July 17th, 2009, he met and spoke with me for 30 minutes. The other clients that Defendant Davis deals with are also given questions on paper for them to write the answers on.

13. . The Defendants altered their paperwork, on the Individual Service Plan to state: May 27, Defendant Davis met with me for medication management, 5/28 for symptom management, and 5/29/09 for health management. Then to 4 times a week that they lied and stated that he met with me- 6/2 for rehab counseling, 6/3 for medication management, 6/4 for symptom management and 6/5 for health management. And then

continued on week for week stating that he met with me for 30 minutes 4times a week for 30 minutes. This is a crime. These documents are clinical. I told Defendant Kesha Graham about this 2 weeks ago, and then the other day. Now on 7/28/09, Defendant Davis did meet with me for 30 minutes. Kesha Graham signed off on the Individual Service Plans for the times when I did not meet with Defendant Dvis.

14. .On any given day, I see 3 or 4 mice coming in and out of my room. There is mice feces in the oven and in the air conditioning/heaters. This has been a long standing problem. Even prior to my arriving at this facility.

15. Each floor has 3 phones not including the phone in the staffs office. Each floor has about 8 residents. When a resident receives a phone call, they are paged to go to the lobby in which there are only 2 available phones. One is directly across the staff office and the other is in the lounge but the lounge is used a lot for the staff to sleep during the weekends, when visitors come. There is no privacy. ON 1 occaision, a staff mentioned something I stated on the phone and another time, Defendant Telford called my Parole Officer and told him something that I had only stated to my girlfriend/power of attorney which was that I was allegedly not allowed to visit my girlfriend because she was in a Program. 95% of the time, they will not take a message when you receive a phone call.

16. Shortly after entering PSCH, I began to have a lot of pain in the calves of my legs, and it was obvious that there was a lot of swelling when I showed it to the staff. Since the staff did not want to take and stay with me, I had to wait a long time to get the appointment in which they would be able to go and stay with me. On 6/8/08, staff refused to stay with me for a physical appointment, 6/12, staff refused to stay with me for dental, 7/6, staff refused to say, 7/13, staff refused to stay with me. I had another appointment due to the swelling in my legs on the 29th of July, 3 others had appointments, the Direct Care Counslor, Sharrolett stated, "Jamels appointment is much more important than yours". I got upset and told them that I would just go by myself since the staff do this everytime I have an appointment but was to anxious to go by myself. 3 times the staff did stay with me. Each time I had to beg and argue with them for them to stay. Each time the staff did not stay with me, Defendant Telford told me that the staff would escort and stay with me.

17. They somehow altered my paperwork and put that I had high blood pressure in which I did not. When they finally did take me and stay with me at the doctors, because they had it written on their paperwork that I suffered from High Blood pressure, the doctor who was a nurse practitioner, put me on the wrong medication which did not help the situation. The doctors office, called Astrocare, is a part of the PSCH agency, affiliated.with them.

18. Residents and staff just walk into my bedroom at any given time even without knocking. The Defendants rules state that the staff at the facility can walk into a

5

residents bedroom at any time, without your presence. The Program Fee is the same as rent, therefore, I believe it to be unconstitutional for the staff to be allowed to do this. Please see below. On or about 6/15/09 a female resident on the floor opened my room door without knocking 2 times, and then an hour later, her best friend, knocked, I did not answer, he opened my bedroom. I told this to Defendant Telford, he stated that this was not allowed, that he would bring it up in a community meeting, when the community meeting occurred, I raised my hand to speak about this and Joel refused to allow me to speak and he refused to mention this.

19. The Defendants paperwork, and the rights state that residents have a right to a safe and sanitary environment, to be free from abuse from staff and other residents, a reasonable degree of privacy in sleeping , to communicate freely with persons inside and outside the facility, a reasonable amount of safe storage space, and an individualized treatment plan. The OMH guidelines state the same. Their mental Health Services Community Residence Resident Rights states, PSCH, INC, is responclble for ensuring the protection of these rights.

20. Defendants rules reguarding stealing- Stealing will not be permitted. It is required that any stolen property be returned to the owner in the original condition or replaced. Theft of either PSCH, INC's or roommates property or money may be subject to criminal prosecution. Reimbursement for the cost of stolen money or property is required.

21. Within the last 2 years, many residents have had their money and or belongings stolen. 1 Resident had 2 thousand dollars stolen from their locked closet in a locked box. Another resident had 2 pairs of designer glasses and a CD player stolen also when they were locked safely. Both residents reported this and nothing was done.

22. Defendants do not and will not provide locks on the bedroom doors to prevent theft and invasion of privacy. Many other agencies, even 24 hour residences provide locks on the consumers doors. The Defendants have this because they want control of the Residents just like the phone situation.

23. ON 6/25/09, Defendant Owen Alexander told me to take a walk with him while he came to me on the corner of East New York Avenue. The cameras that the Defendants have would show this. He specifically stated that he wanted to get out of the cameras view.

24. Defendant Alexander started the conversation by saying that their was a staff meeting concerning a resident that was spreading rumors, (see above resident that was doing this), he stated that he was concerned for me and to be careful.

25. This staff had not ever spoken to me from 5/27 through this date. He then began speaking to me about my girlfriend. I told him that I was going to go see her on Saturday in the Bronx like I had done every weekend since arriving.

26. He asked me for a cigarette. He then specifically asked me if I had money and I replied that I did because I had received a lawsuit settlement not thinking anything about what he was saying.

27. I returned from the Bronx at about 6 PM on 6/27/09 At approximately 10:30 PM, I went to open the closet with the key, to open the locked box, where the money was, so that I could get money out for the next day to buy clothes.

28. I then noticed that all my cash, 8 fifty dollar bills were missing. I began to yell. I went to my direct care counselor, Defendant Davis, he came into my room, saw that the locked box was pried open, and stated 4 times, rasclot which is a curse in Jamacian. It was very appearent that the locked box had been pried into. The metal in the front was bent and the lock would not lock. Defendant Kesha Graham also saw the lock box and stated that it looked like it was pried open.

28 A. I requested a new lock box and Defendant Telford and Graham made me give the tampered box which would also have been evidence before they would give me a new lock box.

28 B. On 7/30/09, Defendant Davis stated that they think I lied about the whole robbery situation so that I can sue them. He was very upset with me because he knew that I was making complaints. He said that he knew that I was writing everything down and that he was getting into trouble and might lose his job. He now told me that he had to meet with me every day.

29. When I returned from the Bronx, Defendant Alexander was in the Lobby Office and did not say anything to me. He then got rude when I told him to call the police to report that the robbery occurred.

30. When another staff came in, Albert Maybank, he checked the box in the office where they have all the keys to the consumers closets and stated that the key for my closet was not there. When I first arrived, I had to wait for the key for several days to the closet.

31. The Police came to take the report after 11 PM. They were getting ready to get off shift on a Saturday night. They did not come to the bedroom and see anything..

32. At any given time, especially on the week-ends, the office is left unattended. I have pictures to show this now. Defendant Alexander was in the lobby of the building on Sunday 6/28/09 with a child when this is also not allowed. Cameras would show this as well. The Lobby Office is not supposed to be left unattended at any time.

7

33. I then began making verbal and written complaints about the robbery. I called OMH, the Commission On Quality Of Care and Advocacy For Persons With Disabilities and the President of PSCH, Inc, Defendant Alan Weinstock.

34. To retaliate against me for making the complaints, Defendant Joel Telford called my Parole Officer not just to tell him that I had Police contact, when he knew that I had already informed the Parole officer of this, but Defendant Telford told my Parole Officer that the locked box did not look like it had been pried open. This implied that I filed a false police report and I could have been arrested and or violated from Parole and re-incarserated. Defendant Telford then insulted me by stating that he needed to see proof of the source of where the money came from except he had seen the settlement papers several times already but was now lying stating that he did not.

35. ON 6/30/09, Because I was continuing to complain, Defendant Kesha Graham stated to me, "Do I have to call your Parole Officer. This is also retaliation..

36. On July 2nd, 2009, Defendant Joel Telford called me down to his office. He inquired as to my Program attendance. I explained and he knew that I was in a lot of pain from the swelling of my legs which is 1 reason, and that I had appointments. Any day that I missed Program was accounted fro. Defendant Telford again called my Parole Office now telling him that I was not attending Program.

37. On July 6, 209, Defendants Latchmine Matlow and Edward Taub came to the facility to meet with me about the robbery. I had already submitted a written statement as to what transpired. I asked them to return the stolen money.

38. I do not believe it was a resident because- I had 30 boxes of tobacco, 97% of the consumers smoke, I had several packs of batteries, 10 dollars in change, and metrocards and they were not touched. Reguardless, the Defendants should have returned the money to me.

39. I later found out , on 7/21/09, that Defendant Owen Alexander was fired and or suspended for stealing, and or fired and or suspended for harassing clients. The staff that work for PSCH can do what they want, when they want, and get away with it. I later noticed that the closet door, where the lock part is, was bent, and the closet looked like it was also tampered with. I have pictures of this as well.

40. ON 7/7/09, Defendant Graham asked me if I went to Program this day and I told her I did. She then accused me of lying. She then stated that the Program called her and told her that I was not there. My case manager at the Program was fully aware of what was going on since the beginning and the Case Manager at the Program and the secretary told me that they did not call the Residence and that the residence called them.

40A. On 8/2/09, Defendant Alexander Knocked on my door. When I said who is it, he opened the door and asked if I was having a party. On 8/3/09, the resident in the next room to me told me and reported to Defendant Telford that his cell phone and a sweat suit was stolen from his room on 8/2/09.

41. On 7/8/09, I met with Defendant Telford and he stated, "you set a tone very early on". I was on the list to g to Great Adventure with the residents. Defendant Telford called my Parole Officer and I was not permitted to go.

42. Both on 7/8 and 7/9/09, Defendant Telford again called my Parole Officer trying to get me into trouble by telling him that I did something with Social Sevurity.. Please see above.

43. Prior to my reporting and complaining about the robbery, Defendant Telford called my Parole Officer only 1 time. After, 5 times within 10 days. This is retaliation, harassment, intimidation and caused me a lot of emotional duress.

44. On Friday July 10th, Defendant Valerie Baker walked into my room without even knocking. She refused to allow me to make a phone call early in the shift. She saw me, I had a phone call later at 9:30, and she told the person that called me that I was sleeping.

44A. On 8/3/09, Defendant Graham had a community meeting and a resident on Horizon I said his alarm clock had been stolen.

45. On July 11, 2009, Went to the Bronx to pick up the July SSI check, a tv, dvd, antenna, and converter box from my girlfriend. When I arrived back at the facility, I got the cart from the back, Defendant Baker saw the stuff and that I was taking it from a cab. She later made me give her the telephone number of the person that gave me the stuff, she called her, and this was very wrong.

46. On Monday July 13th, 2009, Defendant Graham walked into my room without knocking. On Wednesday, July 15th, 2009, a Movie CD was stolen. I told Defendant Telford and he did nothing. He then told me angrily that he was not going to let me use the computer anymore because he accused me of asking another resident to get paperwork off the computer for me. Since arriving, when Defendant Telford found out that I was e-mailing complaints, he thought I did it from the facility computer when I did it from the Program.. Defendant Telford does not allow me to use the computer for 6 weeks and allows other consumers to use it.

9

47. On July 17th, 2009, I returned from Program and my room door was left open. I asked Shawn in maintenuce and he said he was checking everyones closet.. He left the closet door open and when I left I locked it. On July 18th, 2009, Defendant Telford stated that I was not allowed to have soda bottles in my closet which means that he went into the room and the locked closet.

48. On 7/19/09, Defendant Graham called me into the 3rd floor office and told me that it was written that I was being verbally abusive against Defendant Baker. Also on 7/21/09, Staff Charrelote walked into my room without knocking. Defendant Telford asked me for a copy of the police report. When I asked him why, he stated, "your trying to get your money back and then that they needed it for their records.

49.. Defendant Nathene Riley had already told me that that the Quality Assurance Defendants said that there was no proof to substanciate that the money was stolen and they were not going to return it. Tnen Defendant Telford and Allain spoke on the phone and used the police report to state that nothing occurred.

50.. Because defendants had my SSI benefits suspended, I was not able to get the check until 7/12/08. ON or about 7/15/09, Defendant Telford told me that I would be receiving the PNA in a few days. I was then told that I would have the PNA check by Monday or Tuesday 7/29/09. ON 7/28/09, Michael Robinson, Counselor Aide called Defendant Hassanova and was told just another excuse as to why I have not received the PNA Allowance for July and this is another guidleline in the PSCH's papers that state that Iam to receive the PNA when its supposed to. It's a Government Check so they know it will not bounce.

51.. The residence is supposed to be for 2 years and they expect that residents will be ready to move to a more independent living situation within that time frame. Several residents have been there way pastb 2 years. Most of these residents are the ones that drunk and or do drugs in and out of the facility. At times, I have seen them put these residents in rehab.

52.. There is 1 resident, he curses people out, even the director, does whatever he wants, does not go to program, is aggressive when he drinks and when he is not because he is angry that he has no money to buy liquor. On Saturday July 25th 2009, this resident got into a argument with a resident.

53. ON 7/26/09, I heard this resident scream my name in front of my door atleast 4 times... I did not respond. I then heard this resident scream the resident that was in the next room from me name atleast 4 times. There was no response. Then my bedroom door opened by this resident. I went and asked him why he opened my

door without knocking. He began to scream, curse and walk towards me with his fists closed. Thinking that he was going to hit me, I pushed him away.

54. Then this resident started calling me a white ####### and stated that he was going to kill me, and that he was going to cut me. I went downstairs to tell the staff. This resident then came to the lobby and now threatened to cut me in my sleep in front of staff Lendora Garris.

55. He told them that I hit him. Ms. Garris called Defendant Telford who instructed her to call the police based upon this residents continued threats. Ms. Garris and Kesha McKenzie then called me into the office prior to the police arriving. They tried talking to this resident. He continued making threats.

56. When the police came, the staff refused to tell the police that this resident had threatened my life. They only told the police that we had a disagreement.. Under Mental Hygiene Law, a person that is a danger to himself and or others has to be taken out of a facility and evaluated at a psychiatric hospital or, if the act is criminal, to be arrested. The police did not take this resident. When the prior resident threatened staff, police were called 2 times, and he was taken 2 times.

57. When I finished speaking with the police, and I was in the elevator, staff Kesha McKenzie came and stated to me before the door closed, "Don't be so angry", even though I did not exhibit any angry behaviors.

58. When I came down later on, I asked Kesha McKenzie what she meant by saying for me not to be so angry and she was talking like I was the one that was wrong. 1 of the 2 staff wrote that I hit this resident. There was no physical evidence when the police were there to show that I hit him. Iam 248 pounds. I did not hit him. He both admitted and then denied that he opened my bedroom door without knocking.

59. Later that day, Defendant Telford called to see what was going on reguarding the situation. Later on, Defendant Nathene Riley called and inquired as to the situation. Later on, Defendant Kesha Graham, and another staff, Akeil, took this resident into the office, he continued to tell them that he was going to stab me in my sleep. They did not call the police again as they were required to do. Kesha then told me that she would have someone stay on the 3rd floor and did not and even if they did, all they do is sleep.

60. On Monday July 27th, 2009, Defendant Joel Telford called me into his office and was blaming me for this resident walking into my room saying that I could have handled the

11

Situatiion differently. He told me that he talked with the resident. This is another situation where they should have, under the law, moved me or him.

60. ON 7/28/09, a resident opened my door at 6 a.m. and woke me up for morning medication when I have not taken morning medication for 6 weeks. 5 minutes later, a staff, Wanda, opens my door without knocking, telling me to take monring medication. I then went to the office and asked her to show me where in the medication book did it state that I was too take morning meds and she showed me and it looked like the times had been altered.

61. On July 30 th 2009, Defendant Valerie Baker worked the 3-11 shift. At approximately 5:45 p.m. my girlfriend called and she refused me to speak to her. At 6:15 pm, I asked this Defendant" can I please make a phone call", and she stated, "arent you guys eating dinner upstairs". I asked her what that had to do with anything.

62. Defendant Baker then went to speak to Defendant Telford. No where in the rules does it state that consumers cannot use the phone if it is dinner time. Dinner is served anytime between 5:30 and 6:30 pm.

63. 2 weeks ago, I spoke to Defnedant Telford about this staffs attitude. I did not know her name but gave him a psysical description and told him that she was mean by the way she was acting towards me. He laughed and then told me that he would talk to her. I also told Defendant Graham about this staffs behavior and she also said that she would speak to her.

64. Staff bring in their laundry from home and do it at the residence in our washers and dryers. The fee also covers food, and the staff eat and drink the stuff that is for us.

I Seth Ritchie declare under penalty of perjury that the foregoing is true and correct.

Dated July 31st, 2009

*Seth Ritchie*
*Seth Ritchie*
*1900 Sterling Place*
*Brooklyn, N.Y. 11233*
*718-342-4240*